JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

19   1664

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ramon Diaz

**DEFENDANTS**
BTG International Inc., Jennifer Keashon, Guenter Janhofer, Mathew Gantz and John Does X-XX

**(b)** County of Residence of First Listed Plaintiff   Bucks County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Donald R. Reavey, Esquire       (717) 233-4101
Capozzi Adler, P.C.
2933 North Front Street, Harrisburg, PA  17110

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|                                   | PTF | DEF |                                                              | PTF | DEF |
|-----------------------------------|-----|-----|--------------------------------------------------------------|-----|-----|
| Citizen of This State             | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State    | ☐ 4 | ☒ 4 |
| Citizen of Another State          | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                         | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|----------|-------|--|--------------------|------------|----------------|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☒ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 1024(b)(4) and Section 502(c)(1)(B), 29 U.S.C. § 1132(c)(B)
Brief description of cause:
Failure to comply with written request for documents from Plan Administrator

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*:
JUDGE _____   DOCKET NUMBER _____

APR 17 2019

DATE   04/16/2019

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

MSG
MSG

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*19-CV-1664*

*19      1664*

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____330 Jacksonville Road, Apt. 5-101, Warminster, PA  18974-6408_____

Address of Defendant: _____300 Conshohocken State Road, Suite 300, Conshohocken, PA  19428_____

Place of Accident, Incident or Transaction: _____Montgomery County_____

---

*RELATED CASE, IF ANY:*

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not   related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __04/15/2019__     _Donald Reavy_ (signature)     __82498__
                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

**A.**     *Federal Question Cases:*                    **B.**     *Diversity Jurisdiction Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts       ☐ 1. Insurance Contract and Other Contracts
☐ 2. FELA                                                               ☐ 2. Airplane Personal Injury
☐ 3. Jones Act-Personal Injury                                         ☐ 3. Assault, Defamation
☐ 4. Antitrust                                                         ☐ 4. Marine Personal Injury
☐ 5. Patent                                                           ☐ 5. Motor Vehicle Personal Injury
☐ 6. Labor-Management Relations                                       ☐ 6. Other Personal Injury *(Please specify):*
☐ 7. Civil Rights                                                     ☐ 7. Products Liability
☐ 8. Habeas Corpus                                                    ☐ 8. Products Liability – Asbestos
☐ 9. Securities Act(s) Cases                                          ☐ 9. All other Diversity Cases
☐ 10. Social Security Review Cases                                         *(Please specify):* _____
☑ 11. All other Federal Question Cases
    *(Please specify):* _____ERISA_____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___Donald R. Reavey___, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __04/15/2019__     _Donald Reavy_ (signature)     __82498__
                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

APR 17 2019



IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

CIVIL ACTION

Ramon Diaz, individually and on behalf of a class of persons
similarly situated, and on behalf of the BTG International Inc.
Profit Sharing 401(k) Plan,

v.

BTG International Inc., Jennifer Keashon, Guenter Janhofer,
Mathew Gantz and John Does X-XX

**19      1864**

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus- Cases brought under 28 U.S.C. § 2241 through § 2255.                                    ( )

(b) Social Security — Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                                         ( )

(c) Arbitration- Cases required to be designated for arbitration under Local Civil Rule 53.2.            ( )

(d) Asbestos — Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                                ( )

(e) Special Management — Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                                  ( )

(f) Standard Management- Cases that do not fall into any one of the other tracks.                        (X)

_4/16/19_                _Donald Reavy_                _Plaintiff_
**Date**                 **Attorney-at-law**          **Attorney for**

_(717) 233-4101_         _(717) 233-4103_             _Donr@caposziadler.com_
**Telephone**            **FAX Number**               **E-Mail Address**

(Civ. 660) 10/02

APR 17 2019

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAMON DIAZ, individually and on behalf of a class of persons similarly situated, and on behalf of the BTG International Inc. Profit Sharing 401(k) Plan, | : : : : : | Complaint -- Class Action |
| Plaintiff, | : : | |
| vs. | : | Case No.    19    1664 |
| BTG INTERNATIONAL INC., JENNIFER KEASHON, GUENTER JANHOFER, MATHEW GANTZ and JOHN DOES X-XX | : : : : | |
| Defendants. | : : | |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)**

**I.    INTRODUCTION**

1.      Plaintiff, Ramon Diaz, individually and on behalf of a class of all other persons similarly situated ("Plaintiff") in the BTG International Inc. Profit Sharing 401(k) Plan (the "Plan"), and on behalf of the Plan, brings this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against BTG International Inc. ("BTG"), Jennifer Keashon, Guenter Janhofer, Mathew Gantz and John Does X-XX.

2.      Throughout the Class Period (defined below), Defendants allowed the Plan's recordkeeper, John Hancock USA (hereinafter "John Hancock"), to receive excessive and unreasonable compensation through: (1) direct "hard dollar" fees paid by the Plan to John Hancock; (2) indirect "soft dollar" fees paid to John Hancock by non- John Hancock managed sub-advised accounts added and maintained in the Plan to generate fees to John Hancock; (3) fees collected directly by John Hancock from John Hancock -managed sub-

advised accounts, added and maintained in the Plan to generate fees to John Hancock; and (4) float interest, access to a captive market for 401(k) rollover materials to Plan participants, and other forms of indirect compensation.

3.     In order to provide for these revenue streams, Defendants larded the Plan with excessively expensive sub-advised accounts — to the exclusion of superior alternatives — which in turn paid John Hancock out of the excessive fees they collected from Plan investments. In fact, since the Plan is a group annuity 401(k) product, Defendants offered only investment options primarily offered by John Hancock to the exclusion of all other options. Forbes Magazine, a well-respected publication of the financial industry, described insurance based group annuity products as follows:

> Among 401(k) plans designed for small companies, the total fees on some group annuities can top $1,000 per participant every year, or three times what low-cost 401(k) plans cost, according to data provider 401kSource. Have second thoughts after signing up and you'll discover that buying a group annuity is like joining the Sopranos. ... Some insurers, including New York Life, refuse to offer group annuities. Deanna Garen, a managing director for the firm, points out that, in theory, retirement savings plans with annuitization features are a great idea. Unfortunately, says Garen, the ones on the market are too confusing and costly. "They just haven't evolved to the point where there are sensible fee structures," she says.

*See*, https://www.forbes.com/forbes/2009/0713/group-annuity-aig-retirement-plans-from-hell.html#77641d07219f.

4.     These sub-advised accounts collectively underperformed superior alternative funds for a variety of reasons, including the fact that the alternatives charged lower fees by, among other things, removing the additional payments to John Hancock.

5.     Plaintiff brings this action by and through their undersigned attorneys based upon their personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations

in this Complaint.

## II.  NATURE OF THE ACTION

6.      The ERISA fiduciary obligations of retirement plan fiduciaries to the participants and beneficiaries of a plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

7.      When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

8.      Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties owed to the Plan and its participants, including Plaintiff.

9.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries with respect to managing the Plan's assets, Defendants forced the Plan into investments that charged excessive fees that benefitted John Hancock at the expense of the Plan.

10.      This class action is brought on behalf of participants in the Plan who participated from January 1, 2012 through the present (the "Class Period").

## III.  JURISDICTION AND VENUE

11.      **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.      **Personal Jurisdiction.** This court has personal jurisdiction over each of the Defendants because they reside and/or transact business in and have significant contacts

with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Pennsylvania.

13.   **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in West Conshohocken, PA, within this District, the breaches of ERISA took place in this District, and/or a Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in his District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.   PARTIES

1.   Plaintiff, Ramon Diaz, is a resident of Warminster, PA. He is a former employee of BTG International, Inc., and, at all relevant times, a "participant," in and beneficiary of the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Despite moving his personal 401(k) fund from the Plan on or about September of 2016, he nevertheless remains a Plan participant under ERISA since: (1) he was a participant during the times of the alleged breaches of fiduciary duty; (2) may be eligible to receive benefits though the Plan; and (3) maintains a colorable claim for such benefits. He participated in the Plan from May of 2013 until September of 2016.

14.   Plaintiff, like substantially all plan participants and beneficiaries, was not provided any information regarding the substance of deliberations, if any, of Defendants concerning the Plan's menu of investment options or selection of service providers during the

Class Period. Plaintiff otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments offered in the Plan beyond what was provided to him by the Plan. Plaintiff discovered his claims shortly before commencing this action.

15.    Defendant, BTG, is a corporation organized and existing under the laws of Pennsylvania. BTG is the "Plan Sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Under the Plan Documents, BTG is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it is identified in the Plan Documents as having authority to control and manage the operation and administration of the Plan. BTG is a specialty pharmaceutical and interventional medicine company with its principal place of business being 300 Four Falls Corp Center, Suite 300, 300 Conshohocken State Road, West Conshohocken, PA.

16.    BTG is also the "Plan Administrator" under 29 U.S.C. § 1002(16)(A), controlling and managing the operation and administration of the Plan with authority to appoint and delegate discretionary authority to an advisory committee or individual.

17.    The current and former members of that committee, if any, and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiff, are also fiduciaries of the plan under 29 U.S.C. § 1002(21) because they exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. Because those entities and individuals are currently unknown to Plaintiff they are collectively named as John Does X-XX.

18.    Defendant, Jennifer Keashon, was or is an employee or officer of BTG. Pursuant to the Plan Document, in 2017, Keashon had the authority to unilaterally amend or modify any or all provisions of the Plan. This authority gave her discretionary authority and control over Plan assets, rendering her a fiduciary under 29 U.S.C. § 1002(21)(A), as well as the Plan's "named fiduciary" under 29 U.S.C. § 1102(a)(2). Pursuant to this authority, in

2017, Keashon signed the Plan's Form 5500, filed with the Department of Labor.

19.     Defendant, Guenter Janhofer, was or is an employee or officer of BTG. Pursuant to the Plan Document, in 2015 and 2016, Janhofer had the authority to unilaterally amend or modify any or all provisions of the Plan. This authority gave him discretionary authority and control over Plan assets, rendering him a fiduciary under 29 U.S.C. § 1002(21)(A), as well as the Plan's "named fiduciary" under 29 U.S.C. § 1102(a)(2). Pursuant to this authority, in 2015 and 2016, Janhofer signed the Plan's Form 5500, filed with the Department of Labor.

20.     Defendant, Mathew Gantz, was or is an employee or officer of BTG. Pursuant to the Plan Document, in 2012 through 2014, Janhofer had the authority to unilaterally amend or modify any or all provisions of the Plan. This authority gave him discretionary authority and control over Plan assets, rendering him a fiduciary under 29 U.S.C. § 1002(21)(A), as well as the Plan's "named fiduciary" under 29 U.S.C. § 1102(a)(2). Pursuant to this authority, in 2012 through 2014, Gantz signed the Plan's Form 5500, filed with the Department of Labor.

21.     Defendants are, or during the Class Period were, fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

## V.   FACTS

### A.   The Plan and Administration of the Plan

22.     The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

23.    The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

24.    The Plan covers eligible employees of BTG.

25.    BTG is the Plan Sponsor. Accordingly, it is responsible for selecting, monitoring, and removing the investment options in the Plan. At some or all times during the Class Period, it appointed individual Plan Administrators, the Individual Defendants, as described above, as its representative in aiding it in carrying out this duty. The Individual Defendants were or are employees or officers of BTG.

26.    Participants in the Plan have the opportunity to direct the investment of the assets allocated to their individual accounts into the investment options approved by BTG and its Administrators and offered by the Plan, and the return on those investments are credited to each participant's account. Participants who do not direct the investment of the assets are invested in the Plan's default investment option.

27.    During the Class Period, of the Plans more than 100 investment options, 53 of them appear to be managed by John Hancock with the remainder paying revenue sharing to John Hancock.

28.    The Plan's benefits are funded by participants' voluntary tax-deferred and after-tax (Roth) contributions and by employer matching contributions.

29.    The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2017 plan year the Plan had 810 participants with account balances.

30.    At all relevant periods, John Hancock served, and continues to serve, as the Plan's Recordkeeper.

31.    The Recordkeeper of a defined contribution plan, like the Plan, maintains participant account balances, provides a website and telephone number for Plan Participants

to monitor and control their Plan accounts, and provides various other services to the Plan.

32.    These services are highly commoditized, with little or nothing distinguishing the services provided by one recordkeeper over another.

33.    For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industries have developed a variety of pricing and fee structures.

34.    At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

35.    The compensation John Hancock received for its recordkeeping and administration of the Plan was excessive and unreasonable, and the Defendants breached their fiduciary obligations under 29 U.S.C. §1104(a) to ensure that John Hancock's compensation was no more than reasonable.

36.    BTG and the Individual Defendants also failed to have a prudent process for evaluating the amount and reasonableness of this compensation. Instead of evaluating the cost of these services in the marketplace, BTG and the Individual Defendants permitted John Hancock to administer and do the recordkeeping for the Plan without meaningful market competition. At no time did Defendants limit or curtail John Hancock's growing compensation — rather, John Hancock was allowed to generate ever higher fees despite costs which were either stable or falling.

37.    Failing to do so constituted a breach of the duties of prudence in violation of 29 U.S.C. §1104(a) and cost the Plan millions of dollars in excessive fees charged directly by John Hancock or collected by John Hancock from the Plan's investment options through revenue sharing.

38.    Pursuant to 29 U.S.C. §1109, the Individual Defendants are personally liable

and are liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

**B.    John Hancock's Sources of Compensation**

39.    Defendants caused the Plan to purchase recordkeeping, administration, investment management, and other services from various institutions and entities. The fees paid to John Hancock, are, and have been, unreasonable and excessive; especially in light of the Plan's enormous size and asset value. In order to provide for this compensation to John Hancock, Defendants have included inferior and imprudently selected investment options as core Plan investments.

40.    Defendants have caused the amounts that the Plan pays for these services to be assessed against Plan participants' accounts.

41.    Defendants have caused or allowed John Hancock to receive payment in at least five ways:

(A)    By direct disbursement from the Plan to the entity providing the service;

(B)    By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers;

(C)    By receiving, or having the opportunity to receive, Revenue Sharing payments from sub-advised accounts offered through the Plan's Brokerage-Window, through which participants can invest in options not vetted as core investments for the Plan,

(D)    By profiting from the inclusion of proprietary John Hancock - managed sub-advised accounts, which charged fees to all investors, including

the Plan; and

(E)    Through other sources of compensation, including float interest and access to plan participants for marketing purposes.

### i. "Hard Dollar" Payments to John Hancock

42.    Payments in the form of direct disbursements from the Plan to an entity providing a service to the Plan are characterized as "Hard Dollar" payments or "Direct Compensation".

43.    Plan Sponsors, like Defendants, generally disclose to government regulators, in one form or another, Hard Dollar payments made from the Plan to service providers.

44.    When such disclosures are made, understanding the Plan's service provider expenses for a given year *appears* straightforward: the Plan transfers funds in a stated amount to the provider in return for the provider's services. From this, Plan participants and government regulators surmise that the Plan expended the stated amount in exchange for the services.

45.    In this case, it is believed, and, therefore, averred that the Defendants negligently prepared and/or intentionally misstated their form 5500s with the Department of Labor each year from 2012 to the present. From 2012 through 2016, the Plan's Form 5500 state the John Hancock received no direct or indirect compensation whatsoever for its services. The Defendants are obligated as fiduciaries to accurately report this compensation. It wasn't until 2017 the Plan's Form 5500 reported that John Hancock received a total of $318 in direct compensation for its services and no indirect compensation whatsoever. Again, it is believed, and, therefore, averred that this information was not reported accurately. The Defendants, as fiduciaries, should have questioned, on behalf of the members of the Plan, the amount of compensation John Hancock actually received. Failure

to do so is a clear breach of their fiduciary duties.

### ii. Revenue Sharing Payments to John Hancock

46.     While the hard dollar fees above appear modest or misstated, it must be the case that the vast majority of John Hancock's compensation came in the form of Revenue Sharing.

47.     Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

48.     Industry commentators and analysts generally define Revenue Sharing as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record- keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

49.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, sub-advised account, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

50.     In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee (an expense ratio) that is not the true price for which the Fund will provide its service.

51.     Instead, the agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the

cost of its services and to make a profit.

52. The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

53. As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund can receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

54. The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and effort to monitor revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

55. To severely reduce, or eliminate Hard Dollar payments altogether, a plan's fiduciaries and/or a service provider like John Hancock may agree to set a Fund's asset-based fee (its expense ratio) at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover all other Plan services *and more*. This causes a plan's recordkeeping fees to appear deceptively low in disclosures to Plan participants and government regulators.

56. When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

57. Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, and service providers;

Revenue Sharing is not always captured and used for the benefit of the Plan and the participants.

58.      In addition, Plan fiduciaries may limit their selection of funds to only those funds which provide sufficient revenue sharing, thus foregoing superior investment alternatives and selecting or maintaining inferior investment options based upon revenue sharing relationships. These alternatives include different share classes of the identical sub-advised account that charged lower fees because they do not pay revenue sharing, institutional products by the same fund managers which offer materially identical services for even lower cost, or superior alternatives offered by different managers who are unwilling to pay revenue sharing to the Plan recordkeeper.

59.      Plan fiduciaries may do this to conceal the true amount of compensation paid to the recordkeeper or to reduce the plan sponsor's cost at the expense of plan participants.

60.      Nearly all of the actively managed sub-advised accounts included in the Plan must have paid revenue sharing to John Hancock.

61.      In determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, all sources of compensation, including revenue sharing, must also be taken into account.

62.      Adding revenue sharing from non-John Hancock sub-advised accounts to the Hard Dollar fees discussed above, John Hancock's compensation from external, non-John Hancock funds were negligently misstated and/or intentionally omitted in the Plan's 5500 Filings from 2012 to 2017. The sections of the Form 5500s from 2012 to 2017 which would have disclosed the true amount of revenue sharing are line items relating to legal fees, shareholder service fees, Sub TA, float revenue, 12b-1 fee and soft dollar compensation. All these sections were left blank. It wasn't until 2017 that the Defendants listed $318 in direct

compensation on their form 5500. Their form 5500s from 2012 to 2016 listed no amount. The Defendants, as fiduciaries, should have questioned, on behalf of the members of the Plan, why, apparently, John Hancock had only been paid $318 in direct fees in 2017, no direct fees from 2012 to 2016 and no indirect revenue sharing fees from 2012 to 2017. Again, Failure to do so is a clear breach of their fiduciary duties.

### iii. Proprietary Revenue Sharing on John Hancock Funds

63.     In addition to non-John Hancock funds paying revenue sharing to John Hancock, out of the Plan's more than 100 investment options, the Plan has included at least 53 John Hancock managed sub-advised accounts.

64.     John Hancock routinely pays revenue sharing to other vendors who place investments in its funds, and, upon information and belief, attributes revenue sharing payments to its recordkeeping division when, as here, John Hancock is the Plan recordkeeper.

65.     John Hancock's compensation from John Hancock funds again was misstated and/or intentionally omitted in the Plan's 5500 Filings from 2012 to 2017. Again, the sections of the Form 5500s from 2012 to 2017 which would have disclosed the true amount of revenue sharing are line items relating to legal fees, shareholder service fees, Sub TA, float revenue, 12b-1 fee and soft dollar compensation. All these sections were left blank. It wasn't until 2017 that the Defendants listed $318 in direct compensation on their form 5500. Their form 5500s from 2012 to 2016 listed no amount. The Defendants, as fiduciaries, should have questioned, on behalf of the members of the Plan, why, apparently, John Hancock had only been paid $318 in direct fees in 2017, no direct fees from 2012 to 2016 and no indirect revenue sharing fees from 2012 to 2017. Again, Failure to do so is a clear breach of their fiduciary duties. This is especially the case as it pertains to John Hancock

managed funds.

## C.   Excessive Recordkeeping Fees

66.      Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

67.      To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals, every 3–5 years.

68.      Defendants failed to do so.

69.      The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

70.      Larger defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the

plan increases, the per participant fees charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

71.     Many of the Plan's investment options must have made revenue sharing payments to the Plan's record-keeper, John Hancock. In a revenue sharing arrangement, a sub-advised account or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's record-keeper putatively for providing recordkeeping and administrative services for the sub-advised accounts.

72.     Form 5500s filed by the Plan with the United States Department of Labor show that during the Class Period John Hancock received no indirect compensation whatsoever for its recordkeeping services. Once again, the Defendants have failed to make appropriate inquiries on behalf of plan participants about the amount charged for recordkeeping services. The Defendants, as fiduciaries, should have questioned, on behalf of the members of the Plan, the amount of compensation John Hancock actually received, especially as it pertains to funds managed by John Hancock. Failure to do so is a clear breach of their fiduciary duty.

**D.  Defendants' Imprudent Selection and Retention of Options Paying Fees to John Hancock**

73.     In order to facilitate revenue sharing and proprietary John Hancock funds in the Plan, Defendants maintained investment options despite no expectation they would outperform cheaper or superior alternatives. While Plaintiff lacks knowledge of Defendants' fiduciary selection process, a long series of decisions involving proprietary and non-proprietary investments indicate a failure by Defendants to prudently select and monitor the investment options in the Plan. For example:

### i. Alternatives with Lower-Cost and Better Prospects for Future Performance were Available for the Plan

74.    Larger retirement plans, like the Plan, have substantial bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor Magazine (Jan. 2011).

75.    Lower-cost institutional share classes of the same funds are available to institutional investors, like the Plan, that meet the minimum investment amounts for these share classes. In addition, large retirement plans can invest in collective investment trusts or hire investment advisers directly to manage separate accounts for the plan within plan-specific investment parameters and with even lower investment management fees.

76.    Despite these identical lower-cost options, Defendants have invested, and continue to invest, Plan assets in sub-advised accounts with a higher cost than identical sub-advised accounts that were and are available for the Plan.

77.    For the *exact same sub-advised fund option*, the Plan has offered higher-cost share classes of *identical* sub-advised accounts than were available to the Plan, without prudently considering these lower-cost identical alternatives or recapturing the excessive fees for the benefit of the Plan.

78.    The lower-cost identical funds to the Plan's investments include and have

included more than 60% of all the sub-advised accounts selected and maintained in the Plan by Defendants. The appropriate Plan funds are compared to the lower-cost identical funds available in the spreadsheet below:

| Ticker | Name | Plan Assets | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|---|---|---|---|---|---|---|
| JALGX | John Hancock Funds II Multimanager Lifestyle Growth Portfolio Class A | $ 7,640,377 | 1.35 % | R6 | 0.57% | 136.8% |
| JALBX | John Hancock Funds II Multimanager Lifestyle Balanced Portfolio Class A | $ 4,886,050 | 1.32 % | Class 5 | 0.90% | 46.7% |
| JLFAX | John Hancock Funds II Multimanager 2030 Lifetime Portfolio Class A | $ 4,738,364 | 0.99 % | R6 | 0.57% | 73.7% |
| JLHAX | John Hancock Funds II Multimanager 2035 Lifetime Portfolio Class A | $ 4,307,893 | 1.01 % | R6 | 0.59% | 71.2% |
| JALAX | John Hancock Funds II Multimanager Lifestyle Aggressive Portfolio Class A | $ 4,042,978 | 1.39 % | R6 | 0.99% | 40.4% |
| JLIAX | John Hancock Funds II Multimanager 2040 Lifetime Portfolio Class A | $ 3,144,965 | 1.01 % | R6 | 0.59% | 71.2% |
| JLEAX | John Hancock Funds II Multimanager 2025 Lifetime Portfolio Class A | $ 2,971,188 | 0.99 % | R6 | 0.57% | 73.7% |
| JLJAX | John Hancock Funds II Multimanager 2045 Lifetime Portfolio Class A | $ 2,681,249 | 1.01 % | R6 | 0.59% | 71.2% |
| JLKAX | John Hancock Funds Multimanager 2050 Lifetime Portfolio Class A | $ 1,798,139 | 1.02 % | R6 | 0.60% | 70.0% |
| JALMX | John Hancock Funds II Multimanager Lifestyle Moderate Portfolio Class A | $ 1,784,471 | 1.29 % | Class 5 | 0.87% | 48.3% |
| JLDAX | John Hancock Funds II Multimanager 2020 Lifetime Portfolio Class A | $ 1,008,533 | 0.97 % | R6 | 0.55% | 76.4% |
| JLKLX | John Hancock Funds Multimanager 2055 Lifetime Portfolio Class A | $ 746,154 | 1.01 % | Cl 1 | 0.41% | 146.3% |
| JBGAX | John Hancock Funds II Blue Chip Growth Fund Class A | $ 624,835 | 1.14 % | Class 1 | 0.84% | 35.7% |

| Ticker | Name | Plan Assets | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|--------|------|-------------|-------------------|----------------------------|---------------------------|-------------|
| AEPGX | American Funds EuroPacific Growth Fund Class A | $ 365,835 | 0.82 % | R6 | 0.49% | 67.3% |
| JALRX | John Hancock Funds II Multimanager Lifestyle Conservative Portfolio Class A | $ 336,668 | 1.28 % | Class 1 | 0.91% | 40.7% |
| AIVSX | American Funds Investment Company of America Class A | $ 289,158 | 0.58 % | R6 | 0.30% | 93.3% |
| FEPAX | Fidelity Advisor Total Bond Fund Class A | $ 275,042 | 0.75 % | Class I | 0.50% | 50.0% |
| ODMAX | Oppenheimer Developing Markets Fund Class A | $ 266,281 | 1.29 % | Class Y | 1.05% | 22.9% |
| JICPX | John Hancock Funds II Capital Appreciation Fund Class 1 | $ 263,475 | 0.79 % | NAV | 0.74% | 6.8% |
| JSCAX | John Hancock II Small Cap Value Fund Class A | $ 260,880 | 1.55 % | Cl I | 1.24% | 25.0% |
| JDIBX | John Hancock Disciplined Value International Fund Class A | $ 250,116 | 1.30 % | NAV | 0.88% | 47.7% |
| ABALX | American Funds American Balanced Fund Class A | $ 236,570 | 0.57 % | R6 | 0.28% | 103.6% |
| AWSHX | American Funds Washington Mutual Investors Fund Class A | $ 235,266 | 0.57 % | R6 | 0.29% | 96.6% |
| JUEAX | JPMorgan U.S. Equity Fund Class A | $ 203,492 | 0.94 % | R5 | 0.54% | 74.1% |
| JVMAX | John Hancock Funds Disciplined Value Mid Cap Fund Class A | $ 189,230 | 1.10 % | R4 | 1.01% | 8.9% |
| JVLAX | John Hancock Funds Disciplined Value Fund Class A | $ 178,758 | 1.05 % | NAV | 0.69% | 52.2% |
| AGTHX | American Funds The Growth Fund of America Class A | $ 173,338 | 0.62 % | R6 | 0.33% | 87.9% |
| OPPAX | Oppenheimer Global Fund Class A | $ 171,744 | 1.12 % | Cl Y | 0.87% | 28.7% |
| AIIEX | Invesco International Growth Fund Class A | $ 162,950 | 1.32 % | Cl Y | 1.07% | 23.4% |
| JIPAX | John Hancock Funds Strategic Income Opportunities Fund Class A | $ 162,761 | 1.08 % | NAV | 0.66% | 63.6% |
| JLBAX | John Hancock Funds II Multimanager 2015 Lifetime Portfolio Class A | $ 154,116 | 0.95 % | Cl 1 | 0.42% | 126.2% |

| Ticker | Name | Plan Assets | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|--------|------|-------------|-------------------|----------------------------|---------------------------|-------------|
| JLAAX | John Hancock Funds II Multimanager 2010 Lifetime Portfolio Class A | $ 145,411 | 0.92 % | R5 | 0.56% | 64.3% |
| ATHAX | American Century Heritage Fund A Class | $ 129,470 | 1.26 % | R6 | 0.66% | 90.9% |
| OIGAX | Oppenheimer International Growth Fund Class A | $ 122,400 | 1.10 % | Cl Y | 0.85% | 29.4% |
| DSEPX | Domini Impact Equity Fund A Shares | $ 111,659 | 1.09 % | R | 0.80% | 36.3% |
| ANCFX | American Funds Fundamental Investors Class A | $ 104,704 | 0.60 % | R6 | 0.30% | 100.0% |
| JFCAX | John Hancock Funds Fundamental All Cap Core Fund Class A | $ 100,094 | 1.33 % | R4 | 1.18% | 12.7% |
| OIBAX | Oppenheimer International Bond Fund Class A | $ 88,000 | 0.99 % | Cl Y | 0.74% | 33.8% |
| OIEIX | JPMorgan Equity Income Fund Class A | $ 87,024 | 1.01 % | R5 | 0.59% | 71.2% |
| ANWPX | American Funds New Perspective Fund Class A | $ 72,112 | 0.75 % | F3 | 0.45% | 66.7% |
| GOIGX | John Hancock Funds International Growth Fund Class A | $ 65,140 | 1.28 % | NAV | 0.87% | 47.1% |
| GTSAX | Invesco Small Cap Growth Fund Class A | $ 54,973 | 1.20 % | Cl Y | 0.95% | 26.3% |
| JHUAX | John Hancock Funds II U.S. Growth Fund Class A | $ 53,811 | 1.12 % | Cl 1 | 0.80% | 40.0% |
| FLSAX | Fidelity Advisor Leveraged Company Stock Fund Class A | $ 48,627 | 1.07 % | I Class | 0.81% | 32.1% |
| MMUFX | MFS Utilities Fund Class A | $ 45,759 | 1.01 % | R6 | 0.66% | 53.0% |
| CAIBX | American Funds Capital Income Builder Class A | $ 44,176 | 0.59 % | R6 | 0.29% | 103.4% |
| NEWFX | American Funds New World Fund Class A | $ 38,764 | 1.04 % | R6 | 0.64% | 62.5% |
| AMECX | American Funds The Income Fund of America Class A | $ 37,643 | 0.55 % | F3 | 0.28% | 96.4% |
| CWGIX | American Funds Capital World Growth and Income Fund Class A | $ 26,891 | 0.77 % | F3 | 0.45% | 71.1% |
| SHRAX | ClearBridge Aggressive Growth Fund Class A | $ 25,861 | 1.12 % | Cl F1 | 1.10% | 1.8% |
| | | | | | | |

| Ticker | Name | Plan Assets | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|--------|------|-------------|-------------------|----------------------------|---------------------------|-------------|
| AMUSX | American Funds U.S. Government Securities Fund Class A | $ 24,014 | 0.65 % | F3 | 0.28% | 132.1% |
| JFVAX | John Hancock Funds Fundamental Large Cap Value Fund Class A | $ 22,665 | 1.10 % | R4 | 0.96% | 14.6% |
| MITTX | MFS Massachusetts Investors Trust Class A | $ 14,881 | 0.72 % | R6 | 0.39% | 84.6% |
| JASOX | John Hancock Funds II New Opportunities Fund Class A | $ 13,886 | 1.22 % | Cl 1 | 0.85% | 43.5% |
| SMCWX | American Funds SMALLCAP World Fund Class A | $ 12,481 | 1.04 % | R6 | 0.70% | 48.6% |
| SRVEX | Victory Diversified Stock Fund Class A | $ 8,638 | 1.05 % | R6 | 0.78% | 34.6% |
| CWBFX | American Funds Capital World Bond Fund Class A | $ 8,013 | 0.97 % | F3 | 0.55% | 76.4% |
| WASAX | Ivy Asset Strategy Fund Class A | $ 1,926 | 1.13 % | Cl N | 0.69% | 63.8% |

79.     As shown in the table above, the Plan paid fees that were in three cases well over 125% higher than they should have paid for the *identical* product. In four cases these fees were over 100% higher and in 15 cases over 70% higher than they should have paid for the *identical* product. The remainder of the sub-advised accounts, except for two, paid fees there were between 22% and 69% higher than they should have paid for the identical product. Only two of the sub-advised accounts paid fees lower than 10% of what they should have paid.

80.     By way of example, since January 1, 2012, the Plan invested and still invests over $7 million in the John Hancock Funds II Multimanager Lifestyle Growth Portfolio Class A fund. As detailed in Exhibit "A," an identical product was available in the R6 share class with an identical name. Had the Defendants chosen to use this identical product, they would have saved the plan an estimated $30,000 per year which represents the lower

expense ratio .57% as opposed to the expense ratio .99% for the Class A share of the same product. This represents a 136% difference in expense ratios by simply changing the class of the product.

81.     Similarly, as detailed in the chart at Paragraph 76," the Plan invests over $4.5 million in the John Hancock Funds II Multimanager Lifestyle Balanced Portfolio Class A fund. As detailed in Exhibit "A," an identical product was available in the Class 5 share class bearing an identical name. Had the Defendants chosen to use this identical product, they would have saved the plan an estimated $20,000 per year which represents the lower expense ratio of .90% as opposed to the expense ratio 1.32% for the Class A share of the same product. This represents a 46.7% difference in expense ratios by simply changing the class of the product.

82.     As above, these funds have identical managers, holdings, and strategies. The only difference is the share class which, in this case, means the only difference is the amount of revenue sharing. However, because the Plan is paying 136% and 46.7%, respectively, more for the Class A shares, their returns are lower by nearly an identical amount. The failure to utilize these identical investment options continues to cost the Plan an estimated $185,000 per year due to the Plan's failure to select each identical fund identified the table at Paragraph 76.

83.     The failure to select lower-cost share classes for the Plan's sub-advised account options identical in all respects (portfolio manager, underlying investments, structure, and asset allocation) except for cost demonstrates that either Defendants intentionally refused to move the Plan to a cheaper share class, or that it failed to consider the size and purchasing power of the Plan when selecting share classes and engaged in no prudent process in the selection, monitoring, and retention of those sub-advised accounts. Either explanation constitutes a violation of Defendants' fiduciary obligations to the Plan.

*Tibble v. Edison Int'l*, 843 F. 3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical — other than their lower cost — to products the trustee has already selected.").

84.     Had the amounts invested in the higher-cost share class sub-advised account options instead been invested in the lower-cost share class sub-advised account options from January 1, 2012 to the present, Plan participants would have retained an estimated $524,217.00 more in their retirement savings, which would have grown even larger because it would have remained invested in the Plan. A chart illustrating these savings is inserted below:

| Year | LSC Underperformance | Estimated Damages |
|---|---|---|
| 2013 | 31 bps | $   49,742.00 |
| 2014 | 31 bps | $   80,213.00 |
| 2015 | 31 bps | $   96,435.00 |
| 2016 | 30 bps | $ 120,649.00 |
| 2017 | 29 bps | $ 177,178.00 |
| Total |  | $ 524,217.00 |

## ii. Selection of, and failure to remove, excessively expensive and poor performing funds

85.     Defendants systematically maintained the actively managed John Hancock and non- John Hancock sub-advised accounts in the Plan, listed below, despite high fees and poor performance in order to provide revenue sharing to John Hancock.

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JLFAX John Hancock Funds II Multimanager 2030 Lifetime Portfolio Class A | 0.99 % | Target Date | VTHRX Vanguard Target Retirement 2030 Fund Investor Shares | 0.14 % | 0.54% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JLHAX<br>John Hancock Funds II<br>Multimanager 2035<br>Lifetime Portfolio Class A | 1.01 % | Target Date | VTTHX<br>Vanguard Target<br>Retirement 2035 Fund<br>Investor Shares | 0.14 % | 0.54% |
| JLIAX<br>John Hancock Funds II<br>Multimanager 2040<br>Lifetime Portfolio Class A | 1.01 % | Target Date | VFORX<br>Vanguard Target<br>Retirement 2040 Fund<br>Investor Shares | 0.15 % | 0.54% |
| JLEAX<br>John Hancock Funds II<br>Multimanager 2025<br>Lifetime Portfolio Class A | 0.99 % | Target Date | VTTVX<br>Vanguard Target<br>Retirement 2025 Fund<br>Investor Shares | 0.14 % | 0.54% |
| JLJAX<br>John Hancock Funds II<br>Multimanager 2045<br>Lifetime Portfolio Class A | 1.01 % | Target Date | VTIVX<br>Vanguard Target<br>Retirement 2045 Fund<br>Investor Shares | 0.15 % | 0.54% |
| JLKAX<br>John Hancock Funds<br>Multimanager 2050<br>Lifetime Portfolio Class A | 1.02 % | Target Date | VFIFX<br>Vanguard Target<br>Retirement 2050 Fund<br>Investor Shares | 0.15 % | 0.54% |
| JLDAX<br>John Hancock Funds II<br>Multimanager 2020<br>Lifetime Portfolio Class A | 0.97 % | Target Date | VTWNX<br>Vanguard Target<br>Retirement 2020 Fund<br>Investor Shares | 0.13 % | 0.54% |
| JLKLX<br>John Hancock Funds<br>Multimanager 2055<br>Lifetime Portfolio Class A | 1.01 % | Target Date | VFFVX<br>Vanguard Target<br>Retirement 2055 Fund<br>Investor Shares | 0.15 % | 0.54% |
| JJERX<br>John Hancock Funds<br>Multimanager 2060<br>Lifetime Portfolio Class A | 1.00 % | Target Date | VTTSX<br>Vanguard Target<br>Retirement 2060 Fund<br>Investor Shares | 0.15 % | 0.54% |
| JLBAX<br>John Hancock Funds II<br>Multimanager 2015<br>Lifetime Portfolio Class A | 0.95 % | Target Date | VTXVX<br>Vanguard Target<br>Retirement 2015 Fund<br>Investor Shares | 0.13 % | 0.54% |
| JLAAX<br>John Hancock Funds II<br>Multimanager 2010<br>Lifetime Portfolio Class A | 0.92 % | Target Date | VTINX<br>Vanguard Target<br>Retirement Income Fund<br>Investor Shares | 0.13 % | 0.54% |
| JALGX<br>John Hancock Funds II<br>Multimanager Lifestyle<br>Growth Portfolio Class A | 1.35 % | Non-target date balanced | VASGX<br>Vanguard LifeStrategy<br>Growth Fund Investor<br>Shares | 0.14 % | 0.50% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JALBX<br>John Hancock Funds II Multimanager Lifestyle Balanced Portfolio Class A | 1.32 % | Non-target date balanced | VSMGX<br>Vanguard LifeStrategy Moderate Growth Fund Investor Shares | 0.13 % | 0.50% |
| JALAX<br>John Hancock Funds II Multimanager Lifestyle Aggressive Portfolio Class A | 1.39 % | Non-target date balanced | VASGX<br>Vanguard LifeStrategy Growth Fund Investor Shares | 0.14 % | 0.50% |
| JFIVX<br>John Hancock Variable Insurance Trust 500 Index Trust I | 0.30 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| JALMX<br>John Hancock Funds II Multimanager Lifestyle Moderate Portfolio Class A | 1.29 % | Non-target date balanced | VSMGX<br>Vanguard LifeStrategy Moderate Growth Fund Investor Shares | 0.13 % | 0.50% |
| PRHSX<br>T. Rowe Price Health Sciences Fund | 0.77 % | Domestic Equity | VGHAX<br>Vanguard Health Care Fund Admiral Shares | 0.33 % | 0.55% |
| FCNTX<br>Fidelity Contrafund Fund | 0.74 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral | 0.04 % | 0.55% |
| JHMXX<br>John Hancock Money Market Fund Class A | 0.55 % | Money Market | VMRXX<br>Vanguard Prime Money Market Fund Admiral Shares | 0.10 % | 0.16% |
| JBGAX<br>John Hancock Funds II Blue Chip Growth Fund Class A | 1.14 % | Domestic Equity | VIGAX<br>Vanguard Growth Index Fund Admiral Shares | 0.05 % | 0.55% |
| JETSX<br>John Hancock Variable Insurance Trust Total Stock Market Index Trust Series I | 0.58 % | Domestic Equity | VTSAX<br>Vanguard Total Stock Market Index Fund Admiral Shares | 0.04 % | 0.55% |
| JESTX<br>John Hancock Variable Insurance Trust Science & Technology Trust Series I | 1.12 % | Domestic Equity | VITAX<br>Vanguard Information Technology Index Fund Admiral Shares | 0.10 % | 0.55% |
| JTBMX<br>John Hancock Variable Insurance Trust Total Bond Market Trust I | 0.31 % | Domestic Bond | VBTLX<br>Vanguard Total Bond Market Index Fund Admiral Shares | 0.05 % | 0.44% |
| JAMCX<br>JPMorgan Mid Cap Value Fund Class A | 1.24 % | Domestic Equity | VIMAX<br>Vanguard Mid-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| PRSCX<br>T. Rowe Price Science and Technology Fund | 0.80 % | Domestic Equity | VITAX<br>Vanguard Information Technology Index Fund Admiral Shares | 0.10 % | 0.55% |
| AEPGX<br>American Funds EuroPacific Growth Fund Class A | 0.82 % | Int'l Equity | VWILX<br>Vanguard International Growth Fund Admiral Shares | 0.32 % | 0.72% |
| JECIX<br>John Hancock Variable Insurance Trust Mid Cap Index Trust Series I | 0.46 % | Domestic Equity | VIMAX<br>Vanguard Mid-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| JALRX<br>John Hancock Funds II Multimanager Lifestyle Conservative Portfolio Class A | 1.28 % | Non-target date balanced | VSCGX<br>Vanguard LifeStrategy Conservative Growth Fund Investor Shares | 0.12 % | 0.50% |
| JIEQX<br>John Hancock Variable Insurance Trust International Equity Index Trust I | 0.39 % | Int'l Equity | VTIAX<br>Vanguard Total International Stock Index Fund Admiral Shares | 0.11 % | 0.72% |
| JESIX<br>John Hancock Variable Insurance Trust Small Cap Index Trust Series I | 0.53 % | Domestic Equity | VSMAX<br>Vanguard Small-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| AIVSX<br>American Funds Investment Company of America Class A | 0.58 % | Domestic Equity | VTSAX<br>Vanguard Total Stock Market Index Fund Admiral Shares | 0.04 % | 0.55% |
| FEPAX<br>Fidelity Advisor Total Bond Fund Class A | 0.75 % | Domestic Bond | VBTLX<br>Vanguard Total Bond Market Index Fund Admiral Shares | 0.05 % | 0.44% |
| ODMAX<br>Oppenheimer Developing Markets Fund Class A | 1.29 % | Int'l Equity | VEMAX<br>Vanguard Emerging Markets Stock Index Fund Admiral Shares | 0.14 % | 0.72% |
| JICPX<br>John Hancock Funds II Capital Appreciation Fund Class 1 | 0.79 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| | | | | | |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JSCAX<br>John Hancock II Small Cap Value Fund Class A | 1.55 % | Domestic Equity | VSMAX<br>Vanguard Small-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| PRWBX<br>T. Rowe Price Short-Term Bond Fund | 0.47 % | Domestic Bond | VSCSX<br>Vanguard Short-Term Corporate Bond Index Fund Admiral Shares | 0.07 % | 0.44% |
| JDIBX<br>John Hancock Disciplined Value International Fund Class A | 1.30 % | Int'l Equity | VTMGX<br>Vanguard Developed Markets Index Fund Admiral Shares | 0.07 % | 0.72% |
| ABALX<br>American Funds American Balanced Fund Class A | 0.57 % | Non-target date balanced | VWENX<br>Vanguard Wellington™ Fund Admiral™ Shares | 0.17 % | 0.50% |
| AWSHX<br>American Funds Washington Mutual Investors Fund Class A | 0.57 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| JBOAX<br>John Hancock ESG Core Bond Fund Class A | 0.87 % | Domestic Bond | VICSX<br>Vanguard Intermediate-Term Corporate Bond Index Fund Admiral Shares | 0.07 % | 0.44% |
| JUEAX<br>JPMorgan U.S. Equity Fund Class A | 0.94 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| JVMAX<br>John Hancock Funds Disciplined Value Mid Cap Fund Class A | 1.10 % | Domestic Equity | VIMAX<br>Vanguard Mid-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| JVLAX<br>John Hancock Funds Disciplined Value Fund Class A | 1.05 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| JHNBX<br>John Hancock Bond Fund Class A | 0.79 % | Domestic Bond | VFIDX<br>Vanguard Intermediate-Term Investment- Grade Fund Admiral Shares | 0.10 % | 0.44% |
| AGTHX<br>American Funds The Growth Fund of America Class A | 0.62 % | Domestic Equity | VIGAX<br>Vanguard Growth Index Fund Admiral Shares | 0.05 % | 0.55% |
|  |  |  |  |  |  |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| OPPAX Oppenheimer Global Fund Class A | 1.12 % | Int'l Equity | VTIAX Vanguard Total International Stock Index Fund Admiral Shares | 0.11 % | 0.72% |
| AIIEX Invesco International Growth Fund Class A | 1.32 % | Int'l Equity | VWILX Vanguard International Growth Fund Admiral Shares | 0.32 % | 0.72% |
| JIPAX John Hancock Funds Strategic Income Opportunities Fund Class A | 1.08 % | Domestic Bond | VICSX Vanguard Intermediate-Term Corporate Bond Index Fund Admiral Shares | 0.07 % | 0.44% |
| PRSVX T. Rowe Price Small-Cap Value Fund | 0.91 % | Domestic Equity | VSMAX Vanguard Small-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| PAIIX PIMCO Global Bond Opportunities Fund (U.S. Dollar-Hedged) Class A | 0.94 % | Int'l Bond | VTABX Vanguard Total International Bond Index Fund Admiral™ Shares | 0.11 % | 0.66% |
| JIREX John Hancock Funds II Real Estate Securities Fund Class 1 | 0.79 % | Domestic Equity | VGSLX Vanguard Real Estate Index Fund Admiral Shares | 0.12 % | 0.55% |
| PEEAX PGIM Jennison Mid-Cap Growth Fund- Class A | 1.06 % | Domestic Equity | VMGMX Vanguard Mid-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| MALOX BlackRock Global Allocation Fund, Inc. Institutional Shares | 0.84 % | Non-target date balanced | VSMGX Vanguard LifeStrategy Moderate Growth Fund Investor Shares | 0.13 % | 0.50% |
| ATHAX American Century Heritage Fund A Class | 1.26 % | Domestic Equity | VMGMX Vanguard Mid-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| OIGAX Oppenheimer International Growth Fund Class A | 1.10 % | Int'l Equity | VWILX Vanguard International Growth Fund Admiral Shares | 0.32 % | 0.72% |
| DSEPX Domini Impact Equity Fund A Shares | 1.09 % | Domestic Equity | VFTSX Vanguard FTSE Social Index Fund Investor Shares | 0.18 % | 0.55% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| DFEVX<br>DFA Emerging Markets Value Portfolio Institutional Class | 0.57 % | Int'l Equity | VEMAX<br>Vanguard Emerging Markets Stock Index Fund Admiral Shares | 0.14 % | 0.72% |
| FNIAX<br>Fidelity Advisor New Insights Fund Class A | 0.94 % | Domestic Equity | VIGAX<br>Vanguard Growth Index Fund Admiral Shares | 0.05 % | 0.55% |
| ANCFX<br>American Funds Fundamental Investors Class A | 0.60 % | Domestic Equity | VTSAX<br>Vanguard Total Stock Market Index Fund Admiral Shares | 0.04 % | 0.55% |
| JFCAX<br>John Hancock Funds Fundamental All Cap Core Fund Class A | 1.33 % | Domestic Equity | VVIAX<br>Vanguard Value Index Fund Admiral Shares | 0.05 % | 0.55% |
| PRFDX<br>T. Rowe Price Equity Income Fund | 0.65 % | Domestic Equity | VEIRX<br>Vanguard Equity-Income Fund Admiral Shares | 0.17 % | 0.55% |
| OIBAX<br>Oppenheimer International Bond Fund Class A | 0.99 % | Int'l Bond | VTABX<br>Vanguard Total International Bond Index Fund Admiral™ Shares | 0.11 % | 0.66% |
| OIEIX<br>JPMorgan Equity Income Fund Class A | 1.01 % | Domestic Equity | VEIRX<br>Vanguard Equity-Income Fund Admiral Shares | 0.17 % | 0.55% |
| TEDIX<br>Franklin Mutual Global Discovery Fund Class A | 1.21 % | Int'l Equity | VTIAX<br>Vanguard Total International Stock Index Fund Admiral Shares | 0.11 % | 0.72% |
| JESGX<br>John Hancock Variable Insurance Trust Small Cap Stock Trust Series I | 1.11 % | Domestic Equity | VSGAX<br>Vanguard Small-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| JIMSX<br>John Hancock Funds II Mid Cap Stock Fund Class 1 | 0.92 % | Domestic Equity | VMGMX<br>Vanguard Mid-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| ANWPX<br>American Funds New Perspective Fund Class A | 0.75 % | Int'l Equity | VTIAX<br>Vanguard Total International Stock Index Fund Admiral Shares | 0.11 % | 0.72% |
| TGLDX<br>Tocqueville Gold Fund | 1.39 % | Domestic Equity | VGPMX<br>Vanguard Global Capital Cycles Fund Investor Shares | 0.37 % | 0.55% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JHHBX<br>John Hancock High Yield Fund Class A | 0.93 % | Domestic Bond | VWEAX<br>Vanguard High-Yield Corporate Fund Admiral Shares | 0.13 % | 0.44% |
| DFIVX<br>DFA International Value Portfolio Institutional Class | 0.43 % | Int'l Equity | VTRIX<br>Vanguard International Value Fund Investor Shares | 0.40 % | 0.72% |
| GOIGX<br>John Hancock Funds International Growth Fund Class A | 1.28 % | Int'l Equity | VWILX<br>Vanguard International Growth Fund Admiral Shares | 0.32 % | 0.72% |
| FIDAX<br>John Hancock Financial Industries Fund Class A | 1.32 % | Domestic Equity | VFAIX<br>Vanguard Financials Index Fund Admiral Shares | 0.10 % | 0.55% |
| DFSTX<br>DFA U.S. Small Cap Portfolio Institutional Class | 0.37 % | Domestic Equity | VSMAX<br>Vanguard Small-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| GTSAX<br>Invesco Small Cap Growth Fund Class A | 1.20 % | Domestic Equity | VSGAX<br>Vanguard Small-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| JHUAX<br>John Hancock Funds II U.S. Growth Fund Class A | 1.12 % | Domestic Equity | VFIAX<br>Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| PASAX<br>PIMCO All Asset Fund Class A | 1.46 % | Non-target date balanced | VGIAX<br>Vanguard Growth and Income Fund Admiral Shares | 0.23 % | 0.50% |
| FRSGX<br>Franklin Small-Mid Cap Growth Fund Class A | 0.93 % | Domestic Equity | VMGMX<br>Vanguard Mid-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| FLSAX<br>Fidelity Advisor Leveraged Company Stock Fund Class A | 1.07 % | Domestic Equity | VMVAX<br>Vanguard Mid-Cap Value Index Fund Admiral Shares | 0.07 % | 0.55% |
| TAUSX<br>John Hancock Investment Grade Bond Fund Class A | 0.78 % | Domestic Bond | VICSX<br>Vanguard Intermediate-Term Corporate Bond Index Fund Admiral Shares | 0.07 % | 0.44% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| JIIMX John Hancock Funds II International Small Cap Fund Class 1 | 1.10 % | Int'l Equity | VFSVX Vanguard FTSE All-World ex-US Small Capital Index Fund Investor Shares | 0.25 % | 0.72% |
| RYPNX Royce Opportunity Fund Investment Class | 1.18 % | Domestic Equity | VMGMX Vanguard Mid-Cap Growth Index Fund Admiral Shares | 0.07 % | 0.55% |
| MMUFX MFS Utilities Fund Class A | 1.01 % | Domestic Equity | VUIAX Vanguard Utilities Index Fund Admiral Shares | 0.10 % | 0.55% |
| RPSIX T. Rowe Price Spectrum Income Fund | 0.65 % | Domestic Bond | VICSX Vanguard Intermediate-Term Corporate Bond Index Fund Admiral Shares | 0.07 % | 0.44% |
| CAIBX American Funds Capital Income Builder Class A | 0.59 % | Non-target date balanced | VSMGX Vanguard LifeStrategy Moderate Growth Fund Investor Shares | 0.13 % | 0.50% |
| DFFVX DFA U.S. Targeted Value Portfolio Institutional Class | 0.37 % | Domestic Equity | VSIAX Vanguard Small Cap Value Index Fund Admiral Shares | 0.07 % | 0.55% |
| NEWFX American Funds New World Fund Class A | 1.04 % | Int'l Equity | VEMAX Vanguard Emerging Markets Stock Index Fund Admiral Shares | 0.14 % | 0.72% |
| AMECX American Funds The Income Fund of America Class A | 0.55 % | Non-target date balanced | VASGX Vanguard LifeStrategy Growth Fund Investor Shares | 0.14 % | 0.50% |
| RRFAX Federated Real Return Bond Fund Class A Shares | 0.75 % | Domestic Bond | VIPSX Vanguard Inflation-Protected Securities Fund Investor Shares | 0.20 % | 0.44% |
| JNRAX John Hancock II:NatRes | 1.39 % | Domestic Equity | VMIAX Vanguard Materials Index Fund Admiral Shares | 0.10 % | 0.55% |
| CWGIX American Funds Capital World Growth and Income Fund Class A | 0.77 % | Int'l Equity | VTIAX Vanguard Total International Stock Index Fund Admiral Shares | 0.11 % | 0.72% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| SHRAX ClearBridge Aggressive Growth Fund Class A | 1.12 % | Domestic Equity | VWUSX Vanguard U.S. Growth Portfolio Fund Investor Shares | 0.42 % | 0.55% |
| AMUSX American Funds U.S. Government Securities Fund Class A | 0.65 % | Domestic Bond | VFITX Vanguard Intermediate-Term Treasury Fund Investor Shares | 0.20 % | 0.44% |
| KSCVX Keeley Small Cap Value Fund Class A | 1.40 % | Domestic Equity | VSMAX Vanguard Small-Cap Index Fund Admiral Shares | 0.05 % | 0.55% |
| JFVAX John Hancock Funds Fundamental Large Cap Value Fund Class A | 1.10 % | Domestic Equity | VVIAX Vanguard Value Index Fund Admiral Shares | 0.05 % | 0.55% |
| PRTNX PIMCO Real Return Fund Class A | 1.28 % | Domestic Bond | VIPSX Vanguard Inflation-Protected Securities Fund Investor Shares | 0.20 % | 0.44% |
| TEMWX Templeton World Fund Class A | 1.05 % | Int'l Equity | VHGEX Vanguard Global Equity Fund Investor Shares | 0.48 % | 0.72% |
| MITTX MFS Massachusetts Investors Trust Class A | 0.72 % | Domestic Equity | VDIGX Vanguard Dividend Growth Fund Investor Shares | 0.26 % | 0.55% |
| JASOX John Hancock Funds II New Opportunities Fund Class A | 1.22 % | Domestic Equity | VFIAX Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| SMCWX American Funds SMALLCAP World Fund Class A | 1.04 % | Domestic Equity | VHGEX Vanguard Global Equity Fund Investor Shares | 0.48 % | 0.55% |
| SRVEX Victory Diversified Stock Fund Class A | 1.05 % | Domestic Equity | VFIAX Vanguard 500 Index Fund Admiral Shares | 0.04 % | 0.55% |
| CWBFX American Funds Capital World Bond Fund Class A | 0.97 % | Int'l Bond | VTABX Vanguard Total International Bond Index Fund Admiral™ Shares | 0.11 % | 0.66% |
| TEBIX Franklin Mutual Beacon Fund Class A | 1.03 % | Domestic Equity | VASGX Vanguard LifeStrategy Growth Fund Investor Shares | 0.14 % | 0.55% |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee |
|---|---|---|---|---|---|
| WASAX Ivy Asset Strategy Fund Class A | 1.13 % | Non-target date balanced | VSMGX Vanguard LifeStrategy Moderate Growth Fund Investor Shares | 0.13 % | 0.50% |

86.     Nearly all of the 113 sub-advised accounts offered by the Plan between 2012 and 2017 have underperformed investible index benchmarks and have clear and definite lower cost alternatives. Only 9 of the options offered by the Plan lacked a clear lower cost alternative at this time.

87.     Non-proprietary funds offering to pay John Hancock revenue sharing were also added, and continued to be included, in the Plan despite higher fees and lower performance expectations for the future compared to index funds or other investments that would not pay such fees to John Hancock.

88.     Collectively, the Plan's actively managed investments underperformed investible index alternatives each and every year of the Class Period, yet the Plan continues to offer these funds because of the revenue sharing and other profits they provided to John Hancock.

89.     These losses are illustrated in the chart below:

| Year | Active Management Underperformance | Damages |
|---|---|---|
| 2013 | 149 bps | $252,320 |
| 2014 | 185 bps | $489,365 |
| 2015 | 178 bps | $570,965 |
| 2016 | 177 bps | $725,838 |
| 2017 | 176 bps | $1,107,320 |
| Total | | $3,145,810 |

90.     Thus, predictably, for each of the past seven years the Plan would have been better off with index investments.

91.     Defendants' inability to select actively managed funds that outperform the index is consistent with the vast weight of evidence that actively managed funds rarely outperform their indexes over any extended period of time and fund pickers cannot reliably determine which mangers are likely to outperform in the future. Plaintiff does not believe Defendants should have been expected to "beat the market;" rather, that in accordance with their fiduciary duties, Defendants should have systematically reviewed the Plan investment options to ensure they were prudent given their performance and cost.

92.     Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) ("the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

93.     If an individual high-cost fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is

not predictive of whether a fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty- one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst- performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

94.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross- Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J.FIN. 1655, 1690 (2000).

95.    Nobel Laureate William Sharpe also reached the same conclusion that active managers underperform passive managers net of fees. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (January/February 1991).

96.    The Plan's experience backs this up, with Defendants consistently failing to select managers who outperform investible alternatives.

97.    Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds are expected to outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed option for the particular investment

style and asset class.

98.     Against this evidence and Defendants' own experience of failing to identify
actively managed funds likely to outperform, the most plausible explanation for the active
fund's inclusion in the Plan was to facilitate revenue sharing payments and investment
management fees to John Hancock in a way that would not alert the Plan participants to
these payments.

### iii.  The Money Market Fund

99.     Stable value funds and money market funds are two investment vehicles
designed to preserve principal while providing a return.

100.    Stable value funds are a common investment in defined contribution plans
and in fact are designed specifically for use in large defined contribution plans.

101.    The structure of stable value funds allows them to outperform money market
funds in virtually all market conditions and over any appreciable time period. See, *Abbott v.
Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan
Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined
Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L.
REV. 9, 20–27 (2006); Sudheer Chava, *Stable Value Analysis*, Working Paper, June 17,
2017 (available at: http://www.prism.gatech.edu/~schava6/SVReport.pdf).

102.    Stable Value Funds hold longer duration instruments generating excess returns
over money market investments, but utilize insurance contracts to negate the change in risk,
so that to the investor returns are both higher and less volatile. Stable value funds also
provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect
against the loss of principal and accrued interest. This protection is provided through a wrap
contract issued by a bank, insurance company or other financial institution that guarantees

the book value of the participant's investment.

103.   Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).5

104.   The Plan, nevertheless, has invested, as of 2017, over $676,000 in the John Hancock Money Market Fund, a money market fund that paid interest to the Plan of only 0.38%, while paying more fees to John Hancock than what was paid to the Plan participants.

105.   As with their decisions concerning share classes of sub-advised accounts and the decision not to use cheaper institutional products, the decision to use John Hancock's money market fund served to benefit John Hancock at a significant and predicable cost to the Plan.

106.   In real terms, investors in this most-conservative option have lost much of their buying power over the Class Period. Had the Money Market assets been invested in other comparable stable value funds, such as the Vanguard Treasury Money Market Investor, the returns would have been over significantly higher, as shown below.

| Ticker | Name | 2018 | 2017 | 2016 | 2015 | 2014 | Expense Ratio |
|--------|------|------|------|------|------|------|---------------|
| JHMXX | JHancock Money Market A | 1.31% | 0.38% | 0.01% | 0.01% | 0.01% | 0.55% |
| VMRXX | Vanguard Treasury Money Market Investor | 2.01% | 1.08% | 0.55% | 0.11% | 0.05% | 0.10% |
| Inflation | | 2.44% | 2.13% | 2.07% | 1.37% | -0.09% | |
| Difference% | | 34.8% | 64.8% | 98.2% | 90.9% | 80.0% | |

107.   By favoring the interests of John Hancock in the inclusion of the John Hancock Money Market Fund and by failing to invest in institutionally-priced money

market funds, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

108.    Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiff, the Plan, and the other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 135 S.Ct. 1823, 1829 (2015). Defendants therefore breached their fiduciary duty of prudence under ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B).

109.    The Plan lost a significant amount during the class period as a result of losses sustained by the inclusion of the John Hancock Money Market Fund compared to Stable Value alternatives.

## IV.  ERISA'S FIDUCIARY STANDARDS

110.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. ERISA § 404(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)    for the exclusive purpose of:
>
>        (i)    providing benefits to participants and their beneficiaries; and
>
>        (ii)   defraying reasonable expenses of administering the plan; [and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

111.    ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

112.    Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

113.    As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of

> alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

114.    Pursuant to these duties, fiduciaries must ensure that the services provided to

the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

115.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest

of plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and   beneficiaries, as prohibiting    a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The Department of

Labor has repeatedly warned:

> While the law does not specify a permissible level of fees,

it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits

Security Admin. (Feb. 2012),

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

116. In a separate publication, the Department of Labor writes:

> The Federal law governing private-sector retirement plans, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
>
> * * *
>
> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> * * *
>
> By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these

fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

117.     ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), provides a cause of action against a party in interest, such as BTG, for participating in a breach of a fiduciary duty by an ERISA plan fiduciary.

118.     ERISA § 405(a), 29 U.S.C. §1105(a), provides a cause of action against a fiduciary, such as BTG, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

119.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C.

§ 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## V.    CLASS ACTION ALLEGATIONS

120.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

121.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct

individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of:

> All participants in the Plan from January 1, 2012 to the date of judgment. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

122.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(A)    The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over 800 persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(B)    The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(C)    The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the

same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was an investor in the Plan for the majority of the Class Period.

(D)     The class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(E)     Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

(F)     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(G)     In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate

over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.   CLAIMS FOR RELIEF

### A.   Count I - Imprudent Conduct in Connection with Investments

123.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

124.     Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

125.     Defendants caused the Plan to invest millions of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which facilitated revenue-sharing payments back to John Hancock.

126.     Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

127.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

128.     Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

129.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

**B.  Count II - Imprudent Conduct in Connection with Recordkeeping Fees and Total Plan Costs**

130.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.    Defendants are responsible for selecting, monitoring, negotiating with and removing the Plan's Recordkeeper.

132.    Defendants caused the Plan to pay, directly or indirectly, millions of dollars to John Hancock during the Class Period. John Hancock's compensation, and the Total Plan Costs, were excessive and unreasonable given the services provided.

133.    Defendants failed to monitor and control these costs despite lower-cost Recordkeeping alternatives.

134.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

135.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

136.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.      A declaration that the Defendants breached their fiduciary duties under ERISA § 404;

B.      An order compelling the Defendant to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

C.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

D.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in revenue-sharing sub-advised accounts;

E.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for

distribution of those amounts to the extent required by law;

F.       An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.       An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and post-judgment interest; and

H.       An order awarding such other and further relief as the Court deems equitable and just.

Respectfully submitted,
**CAPOZZI ADLER, P.C.**

Date: 1/16/19

Donald R. Reavey, Esquire
Attorney ID No. 82498
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103
Counsel for the Plaintiff and
the Putative Class

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RAMON DIAZ, individually and on behalf of a class of persons similarly situated, and on behalf of the BTG International Inc. Profit Sharing 401(k) Plan, | : <br> : <br> : Complaint -- Class Action <br> : <br> : |
| Plaintiff, | : |
| vs. | : Case No. <br> : |
| BTG INTERNATIONAL INC., JENNIFER KEASHON, GUENTER JANHOFER, MATHEW GANTZ and JOHN DOES X-XX | : <br> : <br> : <br> : |
| Defendants. | : |

**CERTIFICATION OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Capozzi Adler, P.C.

Signature: *Donald Reavey*

Name: Donald R. Reavey, Esquire

Attorney No. (if applicable): 82498